UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DAVID CHARLES BOUWMAN,

          Petitioner,              Case No. 1:15-cv-1327

v.                                     Honorable Gordon J. Quist

HEIDI E. WASHINGTON,

          Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought under 28 U.S.C. § 2254 by a person who, at the time of filing, was on parole status from the Michigan Department of Corrections (MDOC).  Petitioner David Charles Bouwman has since been discharged from parole.  On September 30, 2011, a Leelanau County Circuit Court jury, found Petitioner guilty of third-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520d(1)(c).  On November 7, 2011, the court sentenced Petitioner to a term of imprisonment of twenty to 180 months.

On December 22, 2015, Petitioner filed his habeas corpus petition raising one ground for relief:

> Petitioner Bouwman was denied his federal constitutional rights to a fair trial, and the effective assistance of counsel, where trial defense counsel failed to investigate and challenge junk science concerning vertical gaze nystagmus (VGN) testing, and failed to challenge expert opinion testimony based on sheer speculation.

(Pet., ECF No. 1, PageID.7, 11.)  Respondent has filed an answer to the petition (ECF No. 6) stating that the petition should be denied because it lacks merit.

Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the single challenge Petitioner raises is without merit.  Accordingly, I recommend that the petition be denied.

## Discussion

### I. Factual allegations

On February 10, 2010, Petitioner and David Seabolt drove up to Petitioner's cottage on Lake Leelanau near Traverse City, Michigan.  They made several stops on the way to the cottage, drinking beer at each stop and also having dinner at the last stop.  They arrived at the cottage, turned up the heat, and headed out to another bar while the cottage warmed up.  They drank beer and shots and, eventually, returned to the cottage.  They continued to drink.

Petitioner, who served as the bartender at the cottage, testified that they each drank the equivalent of sixteen shots of tequila.  (Trial Tr. III, ECF No. 7-5, PageID.808-809, 839-840.)  Both men apparently blacked out.  (Trial Tr. II, ECF No. 7-4, PageID.630-631; Trial Tr. III, ECF No. 7-5, PageID.812-813, 837-838.)  Neither man could remember anything past a certain point in the evening.  (*Id.*)

Although Mr. Seabolt does not remember going to bed, he remembers waking up.  Mr. Seabolt testified that he awoke at about 4:30 a.m. on February 11, 2010.  (Trial Tr. II, ECF No. 7-4, PageID.632.)  He was on a bed in one of the cottage's

upstairs bedrooms.  Mr. Seabolt testified that when he initially awoke, his penis was in Petitioner's mouth and Petitioner was sucking on it.  (Trial Tr. II, ECF No. 7-4, PageID.631-632.)  Shortly thereafter, Mr. Seabolt vomited.  (*Id*., PageID.632.)  By the time he was completely awake, he "freaked out."  (*Id*.)  Petitioner was then on the floor, Mr. Seabolt was in the bed with his shirt off and his pants pulled down below his knees.  (*Id*.)  He was enraged.  (*Id*., PageID.633.)

Mr. Seabolt bolted.  (*Id*., PageID.636.)  He took Petitioner's car and left the cottage.  (*Id*.)  He contacted his wife.  (*Id*.)  She joined him and together they went to a hospital in Cadillac, Michigan.  (*Id*., PageID.639.)

Hospital personnel administered several tests on Mr. Seabolt.  (Trial Tr. I, ECF No. 7-3, PageID.377, 385-390.)  The tests confirmed the presence of alcohol, but no drugs.  (*Id*.)  An officer interviewed him at the hospital and a nurse prepared a sexual assault kit.  (*Id*., PageID.352, 391-398, 405-406, 411-412.)  The swab from Mr. Seabolt's penis included DNA that was consistent with Petitioner's DNA.  (Trial Tr. II, ECF No. 7-4, PageID.559.)

The nurse who prepared the sexual assault kit was the nurse who had taken care of Mr. Seabolt from the moment he arrived at the hospital.  She testified that, based on her experience, the way Mr. Seabolt behaved was more indicative of drug use than alcohol use.  (Trial Tr. I, ECF No. 7-3, PageID.377-378.)

The police officer who first interviewed Mr. Seabolt at the hospital, based on Mr. Seabolt's behavior, concluded that Mr. Seabolt was under the influence of narcotics or alcohol.  (Trial Tr. I, ECF No. 7-3, PageID.352-355.)  Accordingly, the

officer performed certain field sobriety tests including a horizontal gaze nystagmus (HGN) test and a vertical gaze nystagmus (VGN) test. (*Id.*, PageID.355-360.) The officer testified that the results of the HGN were consistent with the conclusion that Mr. Seabolt was under the influence of alcohol. (*Id.*, PageID.358.) The officer also testified that the results of the VGN were consistent with the conclusion that Mr. Seabolt was under the influence of a drug. (*Id.*, PageID.369-360.)

Petitioner also suffered the effects of consuming significant amounts of alcohol. Like Mr. Seabolt, Petitioner did not remember going to bed. Nonetheless, he, too, remembered waking up. (Trial Tr. III, ECF No. 7-5, PageID.812-814, 841.) He claims that when he awoke he was fully clothed, on the floor of a bedroom. (*Id.*) He testified that he was awakened by Mr. Seabolt yelling that Petitioner had done something to him. (*Id.*) Petitioner did not believe it was possible that Mr. Seabolt's penis was in Petitioner's mouth. (*Id.*, PageID.836) He indicated to the jury that Mr. Seabolt's accusation was part of an attempt to extort money from Petitioner. (*Id.*, PageID.819, 833-834.)

Petitioner was charged with third-degree criminal sexual conduct under MICH. COMP. LAWS § 750.520d(1)(c). That statute provides:

> (1) A person is guilty of criminal sexual conduct in the third degree if the person engages in sexual penetration with another person and if any of the following circumstances exist:
>
> \*   \*   \*
>
> (c) The actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless.

*Id*. With regard to the elements of the offense, the trial court instructed the jury as follows:

> The defendant is charged with the crime, third degree criminal sexual conduct, to prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt:
>
> First, that the defendant engaged in a sexual act that involved entry of David Seabolt's penis into the defendant's mouth. Any entry, no matter how slight, is enough. It does not matter whether the sexual act was completed or whether semen was ejaculated.
>
> Second, that David Seabolt was physically helpless at the time of the alleged act. Physically helpless means that David Seabolt was unconscious, asleep, or physically unable to communicate that he didn't want to take part in the alleged act.
>
> Third, that the defendant knew or should have known that David Seabolt was physically helpless at the time of the alleged act.

(Trial Tr. IV, ECF No. 7-6, PageID.941-942.) The jury deliberated for several hours before returning a verdict of guilty on the charge.

Petitioner appealed his conviction and sentences raising several issues, including the issue he raises here. The Michigan Court of Appeals issued an unpublished opinion on May 29, 2014, rejecting Petitioner's challenges and affirming the trial court. (Mich. Ct. App. Op., ECF No. 7-9.) Michigan Court of Appeals Judge Douglas Shapiro authored a dissenting opinion that suggested the better course of action would be a remand for an evidentiary hearing to address the very issue that Petitioner raises in this Court. (*Id.*, PageID.1041-1045.)

Petitioner then turned to the Michigan Supreme Court. He filed an application for leave to appeal the Michigan Court of Appeals decision. The Michigan Supreme Court denied leave on December 30, 2014. That decision also, however, was not

unanimous. (Mich. Order, ECF No. 7-11.) Justice Cavanaugh indicated that he would have granted leave to appeal. (*Id.*)

Petitioner did not file a petition for certiorari in the United States Supreme Court. (Pet., ECF No. 1, PageID.3.) Instead, he filed the instant petition.

**II.   AEDPA standard**

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider

the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made

by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### III. Ineffective assistance of counsel

Petitioner contends his counsel rendered ineffective assistance because counsel: (1) failed to investigate and challenge the vertical gaze nystagmus test as "junk science;" and (2) failed to object to testimony from the nurse that she believed Mr. Seabolt may have been suffering from the effects of drugs, testimony that Petitioner characterizes as speculative.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established two elements that must be demonstrated to prevail on a claim of ineffective assistance of counsel: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135

8

(6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The Michigan Court of Appeals evaluated Petitioner's claims of ineffective assistance against the following standard:

> To establish his claim of ineffective assistance of counsel, defendant "must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012). Under this test,

9

> defendant must overcome the strong presumption that, under the circumstances, the challenged action of counsel might be considered sound trial strategy. *LeBlanc*, 465 Mich 578. "[T]his Court neither substitutes its judgment for that of counsel regarding matters of trial strategy nor makes an assessment of counsel's competence with the benefit of hindsight." *People v Matuszak*, 263 Mich App 42, 58; 687 NW2d 342 (2004).

(Mich. Ct. App. Op., ECF No. 7-9, PageID.1035-1036.) The state appellate court did not cite *Strickland*; instead, it relied on state court precedent. The standard the court applied, however, was virtually word-for-word identical to that announced in *Strickland*. Thus, it cannot be said that the state court applied a standard contrary to clearly established federal law.

The state court must not only apply the right standard, it must apply it reasonably. The Michigan Court of Appeals applied the ineffective assistance of counsel standard as follows:

> Counsel was also not ineffective for failing to object to testimony regarding the results of Vertical and Horizontal Gaze Nystagmus Tests (commonly abbreviated VGN and HGN, respectively) or the possibility that the victim had ingested a controlled substance. At trial, several witnesses testified that they believed the victim was under the influence of both a controlled substance and alcohol. First, a nurse at the hospital, Amedee Mortenson, testified that she believed the victim was drugged because his demeanor was inconsistent with alcohol intoxication and said she was surprised to see his drug screen come back negative. Next, police officer Roger Collins testified that he visited the victim in the emergency room and administered the VGN and HGN tests, concluding that the victim was under the influence of drugs or alcohol. Defendant argues that counsel was ineffective for failing to object to Collins's testimony regarding VGN and HGN and for failing to investigate or rebut the evidence with an expert witness. Similarly, defendant argues that counsel was ineffective for failing to object to Mortenson's and the prosecution's speculation that the victim was drugged, despite his negative drug screens. Neither argument has merit.

10

> First, Collins clearly qualified his testimony by noting that the VGN and HGN test results indicate either drug or alcohol consumption. Also, Mortenson testified that the victim was intoxicated by alcohol, with a blood alcohol level of .121. As for Mortenson's speculation about drug intoxication, we conclude that defense counsel could have reasonably decided that there was no further need to draw attention to Mortenson's suspicions given the clear testimony that the drug screen was negative. Similarly, counsel could have concluded the best strategy was not to question the prosecutor's argument in front of the jury. Counsel could have concluded that the jury might question the prosecutor's assertions in light of the testimony and thus possibly question the credibility of the prosecution's case in general.

(Mich. Ct. App. Op., ECF No. 7-9, PageID.1036-1037.)

The court of appeals determined that counsel may have purposely avoided additional emphasis on the testimony of the nurse and the police officer. To challenge the nurse's testimony as speculative and the officer's VGN test as "junk science" with contrary expert testimony would have drawn attention to the issue that Mr. Seabolt may have been drugged. It might also have forced the prosecutor to introduce expert testimony that the negative drug tests did not conclusively establish the absence of drugs. Counsel might reasonably have determined that no objection or contrary evidence could prove the nurse's intuition or the allegedly "junk science" VGN test to be more flawed than the straightforward, objective, scientific blood and urine tests. That was the tack Petitioner's counsel took in closing argument:

> When you want to look at [the nurse] Ms. Mortenson, or even [Mr. Seabolt's initial interviewer] Officer Collins, and try to believe even for a second that these people are experts, and they were not offered as experts, you'll notice when we do our experts like Ms. D'Angela, Mr. Calver, we have to do lawyerly steps, qualify them, and was Nurse Mortenson qualified, no, was Officer Collins qualified as an expert, no, why, because they aren't, they take guesses on their jobs, and they were proven wrong on their guesses. If Ms. Mortenson thought he was drugged because he was reporting to it, that's why she did the tests and

11

the test showed he's lying. It's the objective evidence folks here that kills their case.

(Trial Tr. IV, ECF No. 7-6, PageID.896-897.)

The decision whether to object "in a particular instance is made in the strategic context of the entire trial, [and] any single failure to object does not constitute error unless the information introduced 'is so prejudicial to a client that failure to object essentially defaults the case to the state.'" *Hodge v. Haeberlin*, 579 F.3d 627, 649 (6th Cir. 2009) (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006)). "As a general matter, it is not easy to prevail on claims of ineffective assistance based on failures to object at trial because 'the defendant must overcome the presumption that . . . the challenged action might be considered sound trial strategy.'" *Britt v. Howes*, 404 F. App'x 954, 957 (6th Cir. 2010). Indeed, "experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment," which is why counsel use objections in a strategic manner. *Lundgren*, 440 F.3d at 774. "[N]ot drawing attention to [a] statement may be perfectly sound from a tactical standpoint" and justify a failure to object. *Schauer v. McKee*, 401 F. App'x 97, 101 (6th Cir. 2010). Ultimately, an attorney "must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice." *Id.* at 774-75.

Review of the entire trial transcript reveals that Petitioner's counsel did not hesitate to pose objections when he considered it to be important. Indeed, he posed several objections during Nurse Mortenson's and Officer Collins' testimony, often

when the testimony strayed beyond that which the witnesses directly observed into the realm of scientific expert testimony or speculation. (Trial Tr. I, ECF No. 7-3.) As evidenced by the argument quoted above, it appears that counsel pursued a strategy that would emphasize that the witnesses were not experts and that their non-expert "guesses" were proven wrong by the objective scientific tests. The state appellate court found that such a strategy was reasonable.

Ultimately, the reasonableness of counsel's failure to challenge every possible aspect of the drug-related testimony depends on how important the issue of drugs was to the prosecutor's case. Petitioner states: "The cornerstone of the prosecution case was the claim that Petitioner drugged Seabolt with a "date-rape" drug." (Pet'r's Br., ECF No. 1, PageID.28.) Petitioner's statement is not supported by the record.

The prosecution was required to show that Mr. Seabolt was helpless and that Petitioner knew it. Certainly, the prosecutor could have satisfied that requirement by showing that Petitioner slipped Mr. Seabolt a "date-rape" drug; but, the prosecutor relied principally on a different, much less exotic, theory: he argued that Petitioner got Mr. Seabolt drunk and then took advantage of him. The prosecutor argued in closing:

> I would submit to you that two Jagermeisters, when combined with 16 shots each of Jose Quervo is not the diet of a social drinker, it is not the diet of somebody who doesn't have the ability to hold their liquor, and is instead the artifice of someone who has planned to take advantage of somebody else. Let's not eat, I don't want to ruin the buzz, I'm going to hang back, I'm not going to drink as much until we get back to the cabin, You'll be on your way and I'm just starting my evening.
>
> \* \* \*

> I think someone who gives somebody two shots of Jager and 16 shots of Jose Quervo has more than enough reason to know that the person who ingested that is helpless and incapacitated or asleep and might not wake up during the act, and he says he knew that.

(Trial Tr. IV, ECF No. 7-6, PageID.867.) In the prosecutor's rebuttal argument he stepped back even further, explaining to the jury that a finding of helplessness was warranted even if Mr. Seabolt was simply asleep. (Trial Tr. IV, ECF No. 7-6, PageID.928.)

The prosecutor's decision to forego complete reliance on the drug theory was understandable. There was no evidence of a drug in Petitioner's blood, urine, or vomit; no evidence of drugs in Petitioner's possession; and, importantly, though Petitioner offered Mr. Seabolt a pill purporting to be Ibuprofen or Advil, the prosecutor acknowledged that Mr. Seabolt could not even recall if he took the pill. (Trial Tr. I, ECF No. 7-3, PageID.319.)[1]

That does not mean the prosecutor ignored the evidence that a drug may have been involved, even though such evidence was limited. In closing, the prosecutor referenced Mr. Seabolt's suspicion that more than simply alcohol was involved, Nurse Mortenson's observation that Mr. Seabolt's demeanor was consistent with a person under the influence of drugs, and Officer Collins' similar conclusion from the VGN test. (Trial Tr. IV, ECF No. 7-6, PageID.868, 871.) But, to characterize the potential use of a "date-rape" drug as the cornerstone of the prosecutor's case is simply wrong.

---

[1] Although the prosecutor initially acknowledged that Mr. Seabolt could not remember taking the pill, in closing he noted that Petitioner testified Mr. Seabolt had taken it. (Trial Tr. IV, ECF No. 7-6, PageID.927.)

Under the circumstances, as supported by the record, the Michigan Court of Appeals' determination that counsel was not ineffective for failing to object to Nurse Mortenson's observations, or failing to present expert testimony challenging Officer Collins' VGN test and testimony, is neither contrary to, nor an unreasonable application of, the clearly established federal law set forth in *Strickland*. Petitioner's habeas challenge to his conviction is, therefore, without merit.

## Certificate of Appealability

Unless a certificate of appealability is issued, an appeal of the denial of a habeas corpus petition may not be taken. 28 U.S.C. § 2253(c)(1). A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.

I have examined Petitioner's claim under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this

standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists would not conclude that this Court's denial of Petitioner's claims is debatable or wrong.

## **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.

Dated:  January 18, 2018               /s/  Phillip J. Green
                                                                   PHILLIP J. GREEN
                                                                   United States Magistrate Judge

## **NOTICE TO PARTIES**

ANY OBJECTIONS to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008). General objections do not suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).